MERCURY RECORDS PRODUCTIONS, INC., and others, Plaintiffs-Respondents, v. ECONOMIC CONSULTANTS, INC., d/b/a E-C Tape Service, Inc., and another, Defendants-Appellants.†

Court of Appeals

*No. 76–218. Submitted on briefs July 2, 1979.— Decided August 17, 1979.*
(Also reported in 283 N.W.2d 613.)

† Petition to review denied.

484

486

For the defendants-appellants the cause was submitted on the brief of *Thomas M. Kells* of Milwaukee and *David L. Heilman in pro per* of Brookfield.

For the plaintiffs-respondents the cause was submitted on the brief of *Howard S. Smith* and *Mitchell, Silberberg & Knupp* of Los Angeles, California; *Ronald L. Piette* of Milwaukee; and *Steven E. Keane, Richard S. Florsheim* and *Foley & Landner* of Milwaukee.

Before Decker, C.J., Moser, P.J. and Cannon. J.

MOSER, P.J.  This is a class action brought by the named plaintiffs on behalf of themselves and all persons engaged in the manufacture of records, and brought against the defendants for alleged piracy.  Because of the inordinate number of issues raised on appeal, additional facts will be included as needed in the disposition of the individual issues.

This case began almost seven years ago with the filing of the complaint on December 16, 1972, and an amended complaint on July 27, 1973.  On February 15, 1974, the trial court, Judge Robert W. Landry, presiding, sustained the defendants' demurrer, but did not rule on the plaintiffs' request for a temporary injunction.  On appeal, the Wisconsin Supreme Court reversed the trial court, holding that the complaint stated a cause of action for unfair competition,[1] and remanded the case to the trial court for a determination on the temporary injunction issue.[2]

On September 18, 1974, the trial court issued a temporary injunction, but stayed it for ninety days.  On Sep-

[1] *Mercury Record Productions, Inc. v. Economic Consultants, Inc.,* 64 Wis.2d 163, 173–75, 218 N.W.2d 705, 710–11 (1974).

[2] *Id.* at 188, 218 N.W.2d at 717.

tember 30, 1974, the Wisconsin Supreme Court issued an alternative writ of mandamus ordering the trial court to vacate the stay and to modify the injunction by adding a protective order. On October 3, 1974, Judge Jackson, on behalf of Judge Landry, issued the temporary injunction.[3] On December 9, 1974, the plaintiffs moved the trial court, Judge Barron, presiding, for an order finding the defendants in contempt of the temporary injunction.

On January 26, 1976, the defendants were found in contempt for advertising in Wisconsin, and were ordered to pay within five months the plaintiffs' costs in the contempt proceedings. On July 12, 1976, the plaintiffs moved the trial court for an order of commitment of defendant Heilman for failure to pay the costs as ordered. On September 21, 1976, the trial court ordered defendant Heilman incarcerated for up to six months.

On October 5, 1976, the defendants filed a notice of appeal from the September 21, 1976, order. On October

[3] This enjoined and restrained the defendants from:

(1) Advertising, offering for sale or selling any tape, record, cassette, reel or other device to which has been transferred any part of any recorded performance embodied in any recordings manufactured by any of the plaintiffs or members of the plaintiff class, unless such tape, record or other device advertised, offered for sale or sold has been made by or under the authority of any plaintiff or member of the plaintiff class;

(2) Transferring to any tape, record or other device any part of any recorded performance embodied in any recording manufactured by any of the plaintiffs or members of the plaintiff class, or otherwise misappropriating any of plaintiffs' recordings to defendants' use and profit; and

(3) Taking any action to destroy, transfer, remove, conceal or otherwise place beyond the jurisdiction of the Wisconsin courts any of the defendants' inventory of such tapes and records, other assets, or any of the books, documents and records relating to defendants' sales and inventory of such tapes and records, or taking any action to render nugatory plaintiffs' right to relief and claim for damages.

25, 1976, the defendants filed an amended notice of appeal adding the October 3, 1974, and the January 26, 1976, orders. The plaintiffs' motion to dismiss the amended notice of appeal was denied by the Wisconsin Supreme Court on February 13, 1977.

On November 2, 1976, a notice of hearing for an order approving forms for notice to class members was filed. The trial court, on March 18, 1977, denied the defendants' motion to dismiss this action on the merits, the defendants contending that there was conflict among the plaintiffs and that the delay in notifying the class members had prejudiced the defendants. On April 5, 1977, the trial court denied numerous defense motions concerning the class action and granted, with amendments, the plaintiffs' motion to approve the notices to class members.

On May 19, 1977, the trial court orderd the proposed notices to class members approved and ordered the notices to be mailed and to be published in *Billboard* magazine. A motion to certify the class action was filed on November 9, 1977, and the class was certified on February 7, 1978.

The defendants have raised numerous issues on appeal. We address ourselves to the following issues:

1. Whether the trial court had jurisdiction to issue the orders appealed from prior to the mailing and publication of notices to unnamed members of the plaintiff class.

2. Whether the injunction was unconstitutional because it:

> (a) violated the defendants' rights to freedom of speech and press; and
> (b) unreasonably restrained the defendants in interstate commerce.

3. Whether incarceration was an appropriate sanction for defendant Heilman's alleged contumacious conduct.

## CLASS ACTION

There is no case or statutory law in Wisconsin governing the procedural aspects of class action suits, which are statutorily authorized pursuant to sec. 803.08, Stats. (formerly sec. 260.12).

There are three prerequisites for bringing a class action: (1) there must be a common or general interest shared by all members of the class; (2) the named parties must fairly represent the interest involved; and (3) it must be impracticable to bring all interested parties before the court.[4] All members of the class need not share all interests, but all must share a common interest.[5]

The test for common interest is whether all members of the purported class desire the same outcome of the suit that the alleged representatives of the class desire.[6] It is considered to be in the public interest as declared by the legislature to permit class actions when the three prerequisites are met.[7] In the interest of simplifying the lawsuit and avoiding a multiplicity of litigation, a class action is proper even if each member of the class has a separate cause of action for money damages.[8]

There has been no real guidance given by our supreme court in the area of state procedural requirements for

[4] *Schlosser v. Allis-Chalmers Corp.*, 65 Wis.2d 153, 169, 222 N.W.2d 156, 164–165 (1974).

[5] *State ex rel. Harris v. Larson*, 64 Wis.2d 521, 525, 219 N.W.2d 335, 338 (1974).

[6] *Browne v. Milwaukee Bd. of School Directors*, 69 Wis.2d 169, 181–82, 230 N.W.2d 704, 710–11 (1975), *citing Pipkorn v. Brown Deer*, 9 Wis.2d 571, 101 N.W.2d 623 (1960).

[7] *Mussallem v. Diners' Club, Inc.*, 69 Wis.2d 437, 445, 230 N.W.2d 717, 721 (1975).

[8] *Hicks v. Milwaukee County*, 71 Wis.2d 401, 406, 238 N.W.2d 509, 513 (1976).

class actions. In *Browne v. Milwaukee Board of School Directors,* the court did warn bench and bar alike that, with respect to state class actions, interpretations of federal class action statutes are not necessarily controlling.[9]

Our supreme court has, however, listed four ways by which class members may be bound by the judgment: (1) where they participate; (2) where their interests are joint; (3) where they stand in legal privity; and (4) where they are in fact adequately represented by the parties who are present.[10]

What the defendants object to is the entry of the orders appealed from prior to certification and notification of members of the class. The defendants argue that because of this lack of certification and notification, the trial court acted without jurisdiction in entering the orders appealed from, thus violating the defendants', as well as the absent class members', due process rights. Finally, the defendants contend that because of the lack of certification and notice, the preliminary legal ruling prior thereto is not binding on the court, the defendants, or the absent members. We disagree.

The trial court, in its January 23, 1974, decision, found that a class action in this case was appropriate. The defendants do not appear to challenge the propriety of such finding. Indeed such a determination that a class action is appropriate is largely within the discretion of the trial court and will not be upset absent a finding of abuse of discretion.[11] The trial court found that the delay in giving notice to class members did not prejudice either the defendants or the absent class members.

[9] 69 Wis.2d 169, 183, 230 N.W.2d 704, 711 (1975).

[10] *Schlosser,* 65 Wis.2d at 165, 222 N.W.2d at 162–63.

[11] *Pipkorn,* 9 Wis.2d at 579, 101 N.W.2d at 626.

In *Hansberry v. Lee*,[12] a case decided before the 1966 amendment to the federal class action statutes, the United States Supreme Court held that class actions, "to which some members of the class are parties" and which may bind those represented who were not made parties to it, are the exception to the general rule that one who is not a party and who is not served with process is not bound by the judgment.[13]

*Hansberry* involved the conclusiveness of a prior judgment regarding a restrictive covenant running with the land. The covenant agreement had purportedly been signed by ninety-five percent of the landowners. The second trial court found that, although in fact only fifty-four percent of the owners had signed this agreement, the prior judgment was *res judicata* as to all landowners. The Illinois Supreme Court affirmed.

The United States Supreme Court reversed, holding that the class action procedures used in that case violated the due process clause of the fourteenth amendment. With proper regard for local interests and institutions, the Court refused to mandate that the states or federal government adopt a particular rule for the conclusiveness of a judgment in a class action suit. However, due process requires that the procedures used must fairly insure the interests of the parties who are absent and yet who are to be bound by the judgment.[14] In *Hansberry*, the Court did not find the necessary fair protection due to the conflicts among the interests of those within the represented class.[15]

The Court did recognize, as the Wisconsin Supreme Court subsequently did in *Schlosser v. Allis-Chalmers*

[12] 311 U.S. 32 (1940).
[13] *Id.* at 41.
[14] *Id.* at 42.
[15] *Id.* at 46.

*Corporation,*[16] the same four basic ways parties may properly be bound by a judgment: (1) actual participation; (2) joint interests; (3) legal privity; and (4) adequate representation by present parties.[17]

The Court did not address itself to the need for notice in class action suits, but importantly recognized the necessary division between state and federal law, and set forth the test for due process violations in terms of adequate representation.

In *American Pipe and Construction Co. v. Utah,*[18] the Supreme Court dealt with the notice provisions of Fed. R. Civ. P. 23(c)(1) and (2) in Fed. R. Civ. P. 23(b)(3) class actions. Under Rule 23(b)(3), a court must direct such notice to members of the class as is practicable under the circumstances. In speaking of the need for notice, the Supreme Court stated:

The policies of ensuring essential fairness to defendants and of barring a plaintiff who "has slept on his rights," . . . are satisfied when . . . a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgments. Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.[19]

*Eisen v. Carlisle & Jacquelin,*[20] involved a Rule 23(b)(3) class action. The question was whether the require-

---

[16] 65 Wis.2d 153, 222 N.W.2d 156 (1974).

[17] *Hansberry*, 311 U.S. at 43–44.

[18] 414 U.S. 538 (1974).

[19] *Id.* at 554–55. [Citations omitted.] [Footnotes omitted.]

[20] 417 U.S. 156 (1974).

ments of Rule 23(c)(2) in Rule 23(b)(3) actions are mandatory or merely discretionary.[21] The Supreme Court held only that in class actions pursuant to Rule 23(b)(3), notice as provided for by Rule 23(c)(2) was mandatory. The holding of the case was so limited by the Court.[22]

The Supreme Court again dealt with proper class action representation in *Sosna v. Iowa*.[23] The petitioner in a federal class action suit was challenging the constitutionality of the Iowa one-year residency statute for obtaining a divorce. After dealing with the mootness issue, the Court said that once a named plaintiff in a class action shows the real and immediate threat of injury and shows that he is a member of the class at the time of certification by the district court, the focus shifts from one of justiciability "to the ability of the named representative to 'fairly and adequately protect the interests of the class.'"[24]

The Court further reasoned that because FED. R. CIV. P. 23(c)(3) contemplates all members of the class being bound by the ultimate ruling on the merits, the district court "must assure itself that the named representative will adequately protect the interests of the class."[25] The Court concluded by holding that because there were no apparent conflicts of interest and because the interests of the class had been competently urged at each judicial level, the test of FED. R. CIV. P. 23(a) had been met.

[21] The class in the *Eisen* case consisted of two million plus known or ascertainable members and unknown members making the total class of some six million members. The named plaintiff whose damages were some $70 did not wish to bear the cost of notifying 2,225,000 members individually plus 3,775,000 by publication.

[22] *Eisen, supra*, at 177 n. 14.

[23] 419 U.S. 393 (1975).

[24] *Id*. at 403, *citing* FED. R. CIV. P. 23(a).

[25] *Id*.

■ Although an early determination of the class is essen-tial to the orderly development of a class action suit, it is neither possible nor proper for this court to determine specific time periods within which certification and notification must be made. Trial courts must be given the latitude to be innovative in the handling of class actions and the adoption of fair and expedient procedures.

In an injunction situation such as this, requiring notice to potential class members prior to issuance of a temporary injunction could operate to allow an intolerable situation to continue and thus defeat the purpose of a temporary injunction.

■ The procedures adopted in this case fairly insure the protection of the interests of the parties who are absent and yet who will be bound by the judgment. Additionally, the defendants failed to demonstrate to either the trial court or this court that the procedures have in any way prejudiced either of them.

## INJUNCTION—REGULATION OF COMMERCIAL SPEECH AND THE FIRST AMENDMENT

After finding that the complaint did in fact state a cause of action for unfair competition/misappropriation, the Wisconsin Supreme Court remanded the case to the trial court to conduct hearings and to determine whether an injunction should be issued.[26] The injunction hearings are not a part of the record. The injunction, in substance, prohibited the defendants from advertising, selling or offering for sale the pirated tapes. Additionally, the defendants were enjoined from removing or dam-

---

[26] *Mercury*, 64 Wis.2d at 188, 218 N.W.2d at 717.

aging their books, records and inventory. The injunction was not limited to the boundaries of the state. The defendants had previously placed an order for an advertisement with *Genesis*, a nationally distributed magazine. The defendants could have cancelled this order after the injunction was issued, but instead they changed the ad to advise readers that no sales would be made to Wisconsin residents.

Traditionally, regulation of advertising did not raise constitutional implications because commercial speech had been afforded only minimal first amendment protection.[27] In *Pittsburgh Press Co. v. Human Relations Commission*,[28] the Commission ordered the newspaper to cease and desist placing help-wanted advertisements in a sex-designated classification system. A municipal ordinance forbade employers, among others, from doing so. The paper was ordered to utilize a sexless classification system. The United States Supreme Court affirmed the order, noting that discrimination in employment, undoubtedly a commercial activity, is illegal.[29] The majority held that a newspaper could be constitutionally "forbidden to publish a want ad proposing a sale of narcotics or solicitation of prostitutes."[30] Although the illegality in sex-based job descriptions was less overt than soliciting prostitutes, the court saw no distinction in principle:

Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on

[27] *Valentine v. Chrestensen*, 316 U.S. 52, 54–55 (1952); *Firestone Tire & Rubber Co. v. F.T.C.*, 81 F.T.C. 398, 471–73 (1972), *affd.*, 481 F.2d 246 [6th Cir. (1973)], *cert. denied*, 414 U.S. 1112 (1973).

[28] 413 U.S. 376 (1973).

[29] *Id.* at 388.

[30] *Id.*

advertising is incidental to a valid limitation on economic activity.[31]

The United States Supreme Court has, on numerous occasions, reaffirmed its holding that commercial speech may be regulated[32] by the prohibition of advertisements proposing illegal transactions.[33] There can be no doubt that stealing, euphemistically termed "misappropriation" or "unfair competition" in this case, is an illegal activity, and as such the prohibition of advertisements concerning this illegal activity does not run afoul of the defendants' first amendment rights.

### INJUNCTION—COMMERCE CLAUSE AND RESTRAINT ON ACTIVITIES WITHOUT THE STATE

On September 18, 1974, Judge Landry granted Mercury's request for an injunction. The scope of that

---

[31] *Id.* at 389.

[32] Commercial speech may be properly regulated in the following manner:

(1) reasonable time, place and manner restrictions if:

    (a) justified without reference to the content of the speech;

    (b) the regulations serve a significant governmental interest, and

    (c) the regulations leave open ample alternatives for access to such information;

(2) false, deceptive or misleading advertisements are subject to restraint (to assure truthfulness of information to the consumers), and

(3) advertisements proposing illegal transactions may be suppressed.

*See, Virginia State Board of Pharmacy v. Virginia Consumer Council, Inc.,* 425 U.S. 748, 770–72 (1976).

[33] *Bigelow v. Virginia,* 421 U.S. 809, 822–23 (1975); *Virginia State Board of Pharmacy, supra,* at 772; *Bates v. State Bar of Arizona,* 433 U.S. 350, 384 (1977).

injunction was identical to the October 3, 1974, injunction except that the former did not include a provision with respect to the transfer of the defendants' assets.

On September 25, 1974, the supreme court issued an order to show cause why a writ of prohibition or mandamus should not be granted. The petition challenged the injunction as being unconstitutional because it interfered with interstate commerce and was therefore violative of the commerce clause of the United States Constitution. On September 30, 1974, the supreme court ordered the September 25, 1974, petition denied.

Congress' broad power over interstate commerce is not exclusive.[34] The general rule is that "free flow of interstate commerce and its freedom from local restraints in matters requiring uniformity of regulation are interests safeguarded by the commerce clause from state interference."[35] Where there is concurrent power of the states and congress to regulate, a state may regulate matters of local concern when congress has not acted, even if there is some impact on interstate commerce.[36] Where a state regulates local activities having interstate commerce impact, in order for the regulation to be sustained, it must not discriminate against interstate commerce, it must have a rational relationship to a legitimate state interest, and the burden placed on interstate commerce must be outweighed by the legitimate state interest.[37]

The defendants rely heavily on *Goldstein v. California*.[38] With respect to the defendants' commerce clause

---

[34] *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299 (1851).

[35] *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 770–71 (1945).

[36] *Parker v. Brown*, 317 U.S. 341 (1943).

[37] *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 186–87 (1950) ; *Southern Pacific Co.*, *supra*, at 770.

[38] 412 U.S. 546 (1973).

argument, however, that reliance is misplaced. Goldstein had been convicted of tape/record piracy in California. The Supreme Court dealt only with the issue of the validity of the state statute in light of the copyright and supremacy clauses of the United States Constitution, and as applied to the pirating of recordings made prior to the effective date of the 1971 Federal Copyright Act amendments. The Court did not discuss whether that statute placed an intolerable burden on interstate commerce, holding only that the states were not preempted by any federal action; that Congress did not have exclusive power in this area; that the nature of the matter regulated did not necessarily require complete uniformity of regulation; and, that Congress had not expressed its intention to either protect such recordings or free them from protection.

Both sides agree that the resolution of this issue (whether the state action here unreasonably interferes with or burdens interstate commerce) requires the careful balancing of the burden imposed upon interstate commerce, if any, against the legitimate state interest.[39] The state's interest is in the prevention of the trafficking of pirated tapes. This must be weighed against the burden on interstate commerce—the free flow of pirated tapes restricted by a state court's injunction.[40]

Subsequent to the perfection of this appeal, Wisconsin made tape pirating a crime.[41] The Wisconsin Supreme Court had already determined that tape piracy constitutes intolerable unfair competition and a misappropria-

---

[39] *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524 (1959).

[40] *Id.* See also *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *WKBH Television, Inc. v. Wis. Dept. of Revenue*, 75 Wis. 2d 557, 571–72, 250 N.W.2d 290, 297 (1977).

[41] *See* sec. 943.207, Stats.

tion of another's property.[42] Exploitation of legitimate recording companies by pirates hurts the companies' ability to make a profit on moneymaking records. This in turn prevents the companies from marketing certain kinds of recordings which historically have proven to be moneylosers. The public will suffer from a loss of variety in music.[43] Since pirating detracts from these companies' budgets, the cost of recordings also will increase.[44] Local musicians who are benefited by trust funds contributed to by legitimate recording companies based on their sales are harmed by the pirates who make no such payments based on their sales of such "misappropriated" tapes.

We hold, therefore, that although the temporary injunction imposed a burden on interstate commerce, such burden is not excessive in relation to the local interest.

The defendants argue that the trial court may not enjoin them from doing certain acts outside the state boundaries.

The granting or denial of an injunction is within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion.[45] Injunctions should be issued to "restrain an act that is clearly contrary to equity and good conscience. Whether or not an injunction should be granted depends upon the facts and circumstances in each case."[46]

---

[42] *Mercury*, 64 Wis.2d 163, 218 N.W.2d 705.

[43] *Mercury*, *supra*, at 172, 218 N.W.2d at 708.

[44] *See Hearings of the House Judiciary Committee*, H. R. Rep. 93–1389, 93rd Cong., 2d Sess. 2 (1974).

[45] *Fromm & Sichel, Inc. v. Ray's Brookfield, Inc.*, 33 Wis.2d 98, 103, 146 N.W.2d 447, 450 (1966).

[46] *Bartell Broadcasters, Inc. v. Milwaukee Broadcasting Co.*, 13 Wis.2d 165, 171, 108 N.W.2d 129, 132 (1961).

In *Dalton v. Meister*[47] the supreme court held that a Wisconsin court had personal jurisdiction to issue orders with respect to a resulting trust in Hawaiian land, even if the law of the situs is applicable to the determination of the existence of a fraudulent conveyance of or a resulting trust in the land.[48] "[T]his does not mean that courts of any other state [other than that of the situs] are powerless to issue orders, arising from rights claimed in the proceeds of such land, to persons over whom *in personam* jurisdiction exists."[49] "Wisconsin courts may issue *in personam* orders which may operate on out-of-state property."[50]

Where a state court has personal jurisdiction over the parties, it may order the parties to do or to refrain from doing a thing although the order may have an extra-territorial effect. The extraterritoriality is a factor which does not affect the jurisdiction of the court but which should be considered in determining whether the court should exercise its discretionary equitable powers.[51]

## CONTEMPT PROCEEDINGS

### A. Right to Counsel

The defendant, Heilman, claims that he represented himself during all of the contempt proceedings. The

---

[47] 71 Wis.2d 504, 239 N.W.2d 9 (1976).

[48] *Dalton, supra,* at 511, 239 N.W.2d at 13.

[49] *Id.* at 511–12, 239 N.W.2d at 13–14.

[50] *Id.* at 513, 239 N.W.2d at 14 [Footnote omitted.]; *Goldman v. Bloom,* #76–420, slip. op. at 6–7 (Wis. S. Ct. June 29, 1979).

[51] *See* Messner, *The Jurisdiction of a Court of Equity Over Persons to Compel the Doing,* 14 Minn. L. Rev. 494, 527–29 (1930). *See also* Restatement (Second) of Conflicts §55 (1971) which is in pertinent part the same as Restatement of Conflicts §97 (1934). Restatement (Second) of Conflicts §53 (1971) provides: "A state

record does not support that representation. Despite the trial court's statement on March 16, 1977, that Heilman had been representing himself, there are numerous parts in the record which indicate that Heilman was at least represented by counsel for the corporation during some of the proceedings:

1. Attorney Thomas M. Kells filed a brief ("Defendant David Heilman's Brief in Opposition to Contempt Motion") signed on September 15, 1976, by "THOMAS M. KELLS, Attorney for Defendant, David L. Heilman." (R.313).

2. On July 13, 1976, Attorney Michael J. Finn, "Attorney for Defendants," filed a motion regarding an appeal from the January 26, 1976, order, an order affecting Heilman and not the corporation. (R.254).

3. In the September 20, 1976, decision of the trial court, the appearances of Attorneys Kells and Finn for both appellants. (R.94).

4. The Order for Commitment recites that the defendants appeared "in person and by Thomas M. Kells and Michael J. Finn, their attorneys." (R.118).

5. The contempt motion and proceeding were directed at Heilman alone.

In 1977, the Wisconsin Supreme Court held that a defendant in a civil contempt case brought by a state agency to enforce its orders is entitled to be advised of his right to counsel and, if indigent, the right to be provided with counsel. The court did not mandate a retroactive application of this rule.[52]

Nonetheless, we have carefully reviewed the record in its entirety, and despite defendant Heilman's protesta-

---

has power to exercise judicial jurisdiction to order a person, who is subject to its judicial jurisdiction, to do an act, or to refrain from doing an act, in another state."

[52] *Ferris v. Maass*, 75 Wis.2d 542, 546, 249 N.W.2d 789, 791 (1977).

tions to the contrary, conclude that the defendant was represented by counsel for the corporation.

B. Ability to Pay

On October 16, 1975, the trial court issued an opinion finding that there was a *prima facie* case of contempt against Heilman. The court set November 12, 1975, as the date for an evidentiary hearing on the matter. There is no record of that hearing. In the January 26, 1976 contempt order, the court states that the matter was tried before the court on February 11 and November 12, 1975. Neither hearing is in the record.

On September 20, 1976, the trial court rendered its decision regarding the warrant of commitment for Heilman. (R.94–110). The court refers to a meeting in chambers with all parties present. The date of the meeting is not given and the meeting was off the record. The court summarized what it remembered of the meeting:

1. Plaintiffs requested payment of over $18,000 to them for the cost of the contempt proceedings;
2. That amount was reduced due to a duplication of some legal services and due to Heilman's financial problems;
3. The date for payment was set.

There are conflicting statements within the trial court's decision regarding its knowledge of Heilman's financial ability to pay.

"So I was well aware of the financial ability of Mr. Heilman back in January when the order was entered." (R.97).

. . . .

"It was not until this request for a warrant of commitment that the court had any idea of the assets and income of Heilman during the time in question." (R.98).

. . . .

"I don't believe it is necessary that I would have held a hearing to determine the defendant's financial condi-

tion on January 26th. I believe that we were well aware of it any way; and in addition, that hearing has certainly been complied with during these proceedings on the request for a warrant of commitment." (R.103).

The court discussed the financial condition of the defendant during the five months he was given to pay. The court also discussed various assets of Heilman's which were either disposed of or which he retained.

On September 20, 1976, there is, on the record, a discussion regarding Heilman's commitment, Huber release, and a possible method of paying the initial $3,000. The court stated that it wanted the attorneys to stipulate to a reasonable plan for repayment to be worked out by them. (R.314–16). On September 20, 1976, the court entered an order for Heilman's commitment.

On October 27, 1976, Heilman served on the plaintiffs an order to show cause why the commitment order should not be modified or stayed pending appeal of such order to the state supreme court. (R.115–19). On October 29, 1976, the court rendered its decision. The trial court refused to grant a stay of the commitment order. (R.133). The court again referred to Heilman's testimony, which again is not a part of this record. Again there was a reference to a "program" set up by the parties in chambers. Again this is not a part of the record.

The trial court did not conduct an on-the-record hearing with regard to either the allegation of contempt or the defendant's ability to pay the costs imposed as a result of the contempt finding. Such a hearing is required for due process purposes.[53] Without a finding that the failure to pay costs imposed was willful, contemptuous, and not as a result of the defendant's inability to pay, the defendant may not be held in contempt for failure to

[53] *O'Connor v. O'Connor*, 48 Wis.2d 535, 543, 180 N.W.2d 735, 740 (1970).

pay.[54] "The whole purpose of the hearing is to determine the ability to pay and the reason for the failure to pay the amount of money ordered."[55]

Although it appears from the opinions of the trial court that in fact hearings were held at some point and that Heilman did testify, these hearings are not a part of this appellate record. On appeal, this court is limited to the record.[56]

The parties in this case have involved themselves in a continuous sidestepping foot-dragging affair. It appears from several statements of the trial court that this matter was handled in chambers with all parties present. That chambers meeting is not of record.

In light of the requirement that there be such a due process hearing on the record before the defendant is committed, this court must reverse the contempt order.

We decline to consider the other contempt issues presented by the defendant. Should there be a further petition for contempt, the defendant may, at that time, present any available defenses including the conflicting orders of Waukesha and Milwaukee county circuit courts.

*By the Court.*—Order of Harold B. Jackson, Jr. affirmed; January 26, 1976 order of Michael J. Barron affirmed; September 21, 1976 order of Michael J. Barron reversed; cause remanded for further proceedings consistent with this opinion.

APPEAL from orders of the circuit court for Milwaukee county: HAROLD B. JACKSON, JR., Judge, and MICHAEL J. BARRON, Judge. Order of HAROLD B. JACKSON, JR. *Affirmed.* Orders of MICHAEL J, BARRON. *Affirmed in part, reversed in part.*

---

[54] *Id.* at 542, 180 N.W.2d at 739.

[55] *Id.* at 543, 180 N.W.2d at 740. *See also Besaw v. Besaw,* 89 Wis.2d 509, 521, 279 N.W.2d 192, 197 (1979).

[56] *State ex rel. Wolf v. Town of Lisbon,* 75 Wis.2d 152, 155–56, 248 N.W. 450, 452 (1976); *Schimke v. Milwuakee & Suburban Transport Corp.,* 34 Wis.2d 317, 320, 149 N.W.2d 659, 661 (1967).

Before Decker, C.J., Moser, P.J., and Cannon, J.

PER CURIAM. The respondents have written a letter to Presiding Judge Moser requesting that we, on our own motion, reconsider that portion of our decision dated August 17, 1979, which reverses Judge Barron's order of contempt of September 21, 1976. Reconsideration of a decision is permitted pursuant to Rule 809.24.

In our decision, we acknowledge that there were hearings on the subject of contempt before the trial court. Apparently, some of the hearings were on the record and some were off the record.

In the record presented to this court on appeal, there was not a scintilla of record evidence to show Heilman's ability to pay, except a possible method of paying the initial $3,000 of the $11,598.02 ordered to be paid within five months.

It has long been settled in Wisconsin that a person cannot be held in contempt of court for failure to pay money unless the refusal to pay is willful and contemptuous and not a result of inability to pay. Imprisonment for contempt shall not be ordered when it is made to appear that the default is the result of an inability to pay. *O'Connor v. O'Connor*, 48 Wis.2d 535, 542, 180 N.W.2d 735, 739 (1970). On the incomplete record before us, we could not conclude that Heilman had the ability to pay during the five-month period.

The responsibility for the composition of the appellate record lies with both appellant and respondent. Sec. 809.-15(1)(a)13, Stats. *See Wisconsin Appellate Practice*, Martineau & Malmgren, p. 69 (1978). If the respondent in an appeal feels that the transcript record requested by the appellant is not sufficient for the court of appeals to fully decide the issues presented on appeal, the respond-

ent may file, within ten days of service of the appellant's notice, a designation of additional portions to be included in the transcript. Rule 809.16(1). The respondents in this appeal did not seek to include in this appellate record transcripts of contempt hearings before the circuit court.

The record before us was insufficient to enable us to review the order and conclude that Heilman had the ability to pay. *See Howard v. Duersten*, 81 Wis.2d 301, 308, 260 N.W.2d 274 (1977).

*By the Court.*—Our reconsideration demonstrates no basis for modification of our opinion released on August 17, 1979.

† Petition to review denied.