STATE of Wisconsin EX REL. Joyce JONES and David Galicia, M.D., individually and as representatives of the classes of persons similarly situated, Petitioners-Appellants,

STATE of Wisconsin EX REL. STATE PUBLIC DEFENDER, Attempted Intervenor and Appellant,

v.

Richard GERHARDSTEIN, M.D., the Milwaukee County Combined Community Services Board, Donald Percy, and the Wisconsin Department of Health and Social Services, Respondents.†

Court of Appeals

*No. 85–1718. Submitted on briefs August 5, 1986.—Decided October 28, 1986.*

(Also reported in 400 N.W.2d 1.)

---

† Petition to review granted.

For the petitioners-appellants and attempted intervenor and appellant, the cause was submitted on the briefs of *Thomas K. Zander* of the *Legal Aid Society of Milwaukee, Inc.*

For the respondents the cause was submitted on the briefs of *Bronson C. La Follette*, attorney general, *F. Thomas Creeron, III*, assistant attorney general, and *Robert A. McKnight*, principal assistant corporation counsel of Milwaukee.

Before Moser, P.J., Wedemeyer and Sullivan, JJ.

WEDEMEYER, J.   Joyce Jones and David Galicia (the petitioners) challenge the constitutionality of state statutes permitting the forcible administration of psychotropic drugs to individuals who have been involuntarily committed under the Mental Health Act, but who have not been adjudged incompetent. *See* secs. 51.20, 51.22, 51.59 and 51.65, Stats. They appeal from a judgment denying their motion for class certification and dismissing for mootness their petitions for a writ of habeas corpus and for a declaratory judgment. The state public defender appeals from that part of the same judgment denying its motion to intervene on the petitioners' behalf.[1]

---

[1] After the briefs were filed, the petitioners and the state public defender also petitioned this court to issue a declaration of rights pursuant to art. VII, sec. 5(3) of the Wisconsin Constitution, and secs. 752.01 and 752.02, Stats. Because this petition addresses the very same issues that we examine in this appeal, we decline to entertain it.

We affirm the trial court's discretionary judgment on the intervention issue. We reverse on all other issues because the petitioners' claim falls within a well-established exception to the mootness rule, because the trial court misused its discretion in denying class certification, and because involuntarily committed citizens retain the right under the state constitution to exercise informed consent before psychotropic drugs are administered.

The factual and procedural setting of this case is as follows. Jones, a nurse by profession, underwent a voluntary civil commitment in mid-1979. Galicia, a physician, was committed in 1977, pursuant to sec. 971.17, Stats., after being found not guilty of three criminal charges by reason of mental illness. In late 1979, Jones and Galicia petitioned for both a writ of habeas corpus and a declaratory judgment. They also sought class certification and notice to the class. Citing the fact that both petitioners had been released, the state moved to dismiss their claims for mootness. Meanwhile, the state public defender moved to intervene in the action pursuant to sec. 803.09, Stats. The trial court heard several days of expert testimony and subsequently dismissed the petitions for mootness and denied the motions for class certification and public defender intervention. The petitioners and the state public defender now appeal.

Prior to reaching the constitutional meat of the matter before us, we will dispense with a few procedural bones. The state cites the well-settled principle that an appellate court must affirm a trial court if the latter has reached the proper result, even if for the wrong reason(s). *State v. King*, 120 Wis. 2d 285, 292, 354 N.W.2d 742, 745 (Ct. App. 1984). Under this rubric, the state

first asserts that the petitioners did not obtain jurisdiction over the named defendants. Our review of the record clearly shows that every one of the named defendants, or their lawful representative, admitted service of the amended petitions. We conclude that these documents of record satisfy the requirements of secs. 782.10, 801.11 and 801.14(2), Stats., and totally vitiate the state's argument.

The state also contends that habeas corpus was not an appropriate remedy because there was no challenge to the conditions of confinement and because the petitioners had an adequate remedy at law in an action for declaratory and injunctive relief. This meritless contention can be disposed of with dispatch since our supreme court has repeatedly approved the use of habeas corpus in circumstances similar to the one at bar. *See State ex rel. Memmel v. Mundy*, 75 Wis. 2d 276, 288, 249 N.W.2d 573, 579–80 (1977) (habeas corpus proper remedy for indigent persons involuntarily committed in denial of their rights to effective assistance of counsel and due process). Additionally, we note that the petitioners met this allegation of error by filing an amended petition for declaratory judgment.

## PUBLIC DEFENDER INTERVENTION

We now turn to the public defender's claim that the trial court's denial of its motion to intervene was a misuse of discretion. Section 803.09(2), Stats., provides that a court has discretion to determine whether the proposed intervention "will unduly delay or prejudice the adjudication of the rights of the original parties." There

is no precise formula to indicate whether a motion to intervene is timely, but the trial court must consider whether the proposed intervenor acted promptly under the circumstances and whether the intervention will prejudice the original parties to the lawsuit. *State ex rel. Bilder v. Township of Delavan*, 112 Wis. 2d 539, 550, 334 N.W.2d 252, 258 (1983).

The trial court here found that the motion to intervene came more than seven months after the action was commenced, that the public defender gave no reason for this delay, and that the procedural posture of the habeas corpus action was already in the "critical stage" when this motion was made. The court then concluded that the motion was both prejudicial and untimely.[2] Upon

---

[2] The trial court's findings of fact include:

17. On May 1, 1980, the state public defender filed a motion to intervene in this action. . . .

. . .

19. The motion to intervene was filed more than seven months after the original action was commenced. . . .

20. The motion to intervene was filed after substantial portions of petitioners' testimony had already been completed.

21. The state public defender made no claim that he did not know of the filing of this action or of the commencement of testimony in this action.

22. The state public defender made no claim that he should not have known of the filing of this action or the commencement of testimony in this action and it is difficult to envision any set of facts under which such a claim could be sustained.

. . .

25. By commencing this action as a *habeas corpus* action and requesting the taking of immediate testimony, petitioners' counsel indicated that this litigation had reached a critical stage even before such testimony was taken.

26. The commencement of this action as a *habeas corpus* action precluded respondents from engaging in any form of discovery.

review, we hold that the trial court's findings of fact are not clearly erroneous, sec. 805.17(2), Stats., and that these findings provide a reasonable basis for the court's conclusion of prejudice and untimeliness. We therefore affirm the trial court's decision not to permit the state public defender to intervene.

## MOOTNESS and CLASS CERTIFICATION

An issue is moot when a determination is sought which can have no practical effect on a controversy. *Warren v. Link Farms, Inc.*, 123 Wis. 2d 485, 487, 368 N.W.2d 688, 689 (Ct. App. 1985). Generally, moot issues will not be considered on appeal, but an exception is made if the issue has great public importance, a statute's constitutionality is involved, or a decision is needed to guide the trial courts. *Id.* Here, the trial court decided that because neither Jones nor Galicia were currently under commitment orders, this case was analogous to *In re G.S., Jr.*, 118 Wis. 2d 803, 348 N.W.2d 181 (1984), and that the mootness rule applied. We disagree.

---

27. This litigation had reached a critical stage when testimony was first received on behalf of each of the petitioners.

28. It would now be and was on May 1, 1980, prejudicial to the respondents to require them to defend against the claims of unknown, unnamed persons.

The trial court's conclusions of law contained the following paragraph:

8. Even if the motion to intervene had contained well-pleaded, identifiable new claims, it was untimely.

We hold that paragraphs 17, 19, 20, 21, 22, 25, 26 and 27 are findings of fact, and that paragraphs 28 and 8 are conclusions of law.

169

In *G.S.*, both parties conceded that the issue of forcible administration of psychotropic drugs was moot because G.S.'s involuntary commitment had lapsed. *Id.* at 805, 348 N.W.2d at 183. In that case, however, G.S. was the only claimant and no class action was commenced. In contrast, the present claims were initially intended to protect others who had the same constitutional interest at stake.

The state itself acknowledges the pervasive nature of the problem by admitting that psychotropic drugs have been administered, in nonemergency situations, to involuntarily committed individuals without their consent, and that this conduct will continue. Thus, the issue presented here is yet another exception to the mootness rule: "a question is capable and likely of repetition and yet evades review because the appellate process usually cannot be completed and frequently cannot even be undertaken within a time that would result in a practical effect upon the parties." *Id.*, 348 N.W.2d at 182-83. Because the petitioners press a constitutional issue of a repetitive nature, we conclude that the trial court erred in dismissing the case as moot.

We also reverse the trial court's denial of the petitioners' motion for class certification. Class action suits are statutorily authorized pursuant to sec. 803.08, Stats., but there are three prerequisites: (1) there must be a common or general interest shared by all members of the class; (2) the named parties must fairly represent the interest involved; and (3) it must be impracticable to bring all interested parties before the court. *Mercury Records Productions, Inc. v. Economic Consultants, Inc.*, 91 Wis. 2d 482, 490, 283 N.W.2d 613, 617 (Ct. App.

1979). The determination that a class action is appropriate is a matter of trial court discretion and will not be reversed absent a misuse of discretion. *Id.* at 491, 283 N.W.2d at 618. Such misuse occurs when a trial court exercises its discretion on the basis of an error of law or on irrelevant or impermissible factors. *Barstad v. Frazier*, 118 Wis. 2d 549, 554, 348 N.W.2d 479, 482 (1984).

This court has held that all members of a class need not share all interests, but all must share a common interest. *Mercury Records*, 91 Wis. 2d at 490, 283 N.W.2d at 617. The test for common interest is whether all members of the purported class desire the same outcome of the suit that the alleged representatives of the class desire. *Id.* Here, the trial court adopted, without comment, the state's claim that the petitioners had failed to establish that they shared a common interest with other members of the proposed class in obtaining a judicial determination that psychotropic drugs were being unconstitutionally administered to them. In light of the state's concession that it had used, and would continue to use, psychotropic drugs on involuntarily committed individuals, regardless of their competency, we conclude that the putative class shares a common interest and that the trial court's finding in this matter is clearly erroneous. Sec. 805.17(2), Stats.

We also note that the trial court did not even consider the impracticality issue and that it based its decision in part on an erroneous perception that the members of the proposed class sought damages. Given the status of the proposed class, and the subject matter of this case, we hold that it is obviously impractical to bring all interested parties before the court. As for the

illusory issue concerning damages, the trial court reasoned that because the damages due each member of the proposed class would depend on the amount of psychotropic drugs administered, the time period involved, and the indirect physical and psychological effects caused by the drugs, this action was not appropriate for class certification. The record, however, demonstrates that the petitioners sought no damages and that they properly limited their demand to prospective injunctive relief. Thus, the trial court's finding in this regard is also clearly erroneous.

The *Mercury Records* court held that the public interest, as declared by the legislature in sec. 803.08, Stats., permitted class actions when the three prerequisites listed above are met. 91 Wis. 2d at 490, 283 N.W.2d at 617. Because all members of the proposed class share a common interest, because Jones and Galicia fairly represent the interest involved, and because it is impracticable to bring all interested parties before the court, the trial court misused its discretion in denying class status to the petitioners and the purported members of their class. Having concluded that a class action is proper, and that the constitutional issue before us is not moot, we now address the merits of the petitioners' argument.

## EQUAL PROTECTION

The petitioners contend that the forcible administration of psychotropic drugs, in a nonemergency setting, to competent, involuntarily committed individuals, violates the equal protection guarantees of both the state and federal constitutions. Specifically, they allege that those individuals who are involuntarily committed under secs. 51.20(13), 51.43(13)(g), 971.14(5), and

971.17(1), Stats., are denied the right to exercise informed consent to medical treatment that is granted to voluntary psychiatric patients and precommitment detainees. *See* secs. 51.15, 51.20(8), and 51.61(1)(g), Stats. Because we conclude that our state constitution prohibits this arbitrary classification, we shall not consider the petitioners' federal constitutional challenge. *See State v. Doe*, 78 Wis. 2d 161, 172, 254 N.W.2d 210, 216 (1977).

Judicial review of legislation begins with a presumption of constitutionality and with a requirement that the challenger prove unconstitutionality beyond a reasonable doubt. *Quinn v. Town of Dodgeville*, 122 Wis. 2d 570, 577, 364 N.W.2d 149, 154 (1985). Equal protection of the law is denied only when the legislature makes irrational classifications. *Omernik v. State*, 64 Wis. 2d 6, 18–19, 218 N.W.2d 734, 742 (1974). We must consider whether there is an arbitrary discrimination in the statutes or in their application, and whether there is a rational basis which justifies the difference in rights afforded. *State ex rel. Watts v. Combined Community Services Board*, 122 Wis. 2d 65, 77, 362 N.W.2d 104, 110 (1985) (citation omitted).

In the instant case, the petitioners structure their constitutional challenge on three bases: (1) the denial of informed consent infringes on the fundamental rights of privacy, personal security and bodily autonomy; (2) the Mental Health Act, ch. 51, Stats., creates two classes of mental patients who are accorded different treatment rights; and (3) there is no rational basis for the difference. In making an equal protection analysis, we are mindful of the general rule that if a statutory classifica-

tion does not involve a suspect class or a fundamental interest, it will be sustained if there is any rational basis to support it. *State v. Bleck,* 114 Wis. 2d 454, 468, 338 N.W.2d 492, 499 (1983). Because we conclude that the challenged statutes will not withstand even this less-stringent "rational basis" test, we will only briefly analyze the fundamental liberty interest at stake in this case for the purpose of better understanding the petitioners' position.

Article I, sec. 1 of the Wisconsin Constitution declares that all our citizenry have "certain inherent rights" and that among these are "life, liberty and the pursuit of happiness." Article I, sec. 11 guarantees the "right of the people to be secure in their persons . . . against unreasonable . . . seizures." It cannot be gainsaid that the concept of liberty includes the fundamental right to physical privacy or bodily autonomy. Throughout the development of the common law there is overwhelming evidence that no right is older or more deeply rooted than the individual's right to be free from unwanted and unwarranted personal contact.

In the medical field, this common law protection against assault and battery finds expression in the doctrine of informed consent. As our supreme court explained in *Throne v. Wandell,* 176 Wis. 97, 101, 186 N.W. 146, 147 (1922) (citations omitted):

> Where a patient is in possession of his faculties and in such physical health as to be able to consult about his condition, and where no emergency exists making it impracticable to confer with him, his consent is a prerequisite to a surgical operation by his physician. An operation without the consent of a

patient under such circumstances constitutes a technical assault.

Although the case at bar does not involve a surgical operation but, rather, the forced ingestion of a drug, the doctrine of informed consent still pertains. The unauthorized use of psychotropic drugs to treat mental illness not only infringes upon the right to bodily autonomy, but may also cause actual harm due to adverse side effects.[3] Thus, we conclude that the petitioners have amply demonstrated the existence of a fundamental liberty interest.

The state does not contest the fact that different rights are accorded to those individuals who are involuntarily committed pursuant to sec. 51.20(13), Stats., as opposed to those persons who are voluntarily admitted or held in precommitment detention pursuant to secs. 51.15(8) and 51.20(8)(c), Stats. The crux of this disparate treatment is contained in sec. 51.61(1)(g), Stats., which provides in part:

> Prior to the final commitment hearing and court commitment orders, [patients] have the right to refuse all medication and treatment except as ordered by the court under this paragraph, or in a situation where such medication or treatment is necessary to prevent serious physical harm to the

[3] Even the state concedes that psychotropic drugs have adverse side effects; it only disputes their frequency and severity. Expert testimony established that the various pharmacological agents used to treat mental illness produce numerous muscular side effects as well as a serious neurological disorder, termed tardive dyskinesia, which causes uncontrollable contortions of the torso and the tongue, lips and cheeks. Some of these side effects may become permanent afflictions. Plus, there was testimony that patients taking psychotropic drugs have a greater risk of heart attack.

patient or to others.... *Following a final commit-
ment order, the subject individual does not have the
right to refuse medication and treatment....*
[Emphasis added.]

This section guarantees that precommitment detainees
may refuse medication unless a court has held a hearing
and found that the detainee is incompetent to under-
stand the advantages and disadvantages of the proposed
treatment.[4]

The petitioners properly concede that sec.
51.61(1)(g), Stats., rationally recognizes two legitimate

---

[4] Section 51.61(1)(g), Stats., reads in full:

(g) Prior to the final commitment hearing and court commit-
ment orders, [patients] have the right to refuse all medication and
treatment except as ordered by the court under this paragraph, or in
a situation where such medication or treatment is necessary to pre-
vent serious physical harm to the patient or to others. Medications
and treatment during such period may be refused on religious
grounds only as provided in par. (h). At or after the hearing to
determine probable cause for commitment but prior to the final
commitment order, the court may issue an order permitting medica-
tion to be administered to the individual regardless of his or her
consent if it finds that such medication will have therapeutic value
and will not unreasonably impair the ability of the individual to
prepare for or participate in subsequent legal proceedings, and that
there is probable cause to believe that the individual is not compe-
tent to refuse medication. Before issuing such an order, the court
shall hold a hearing on the matter which meets the requirements of
s. 51.20(5), except for the right to a jury trial. An individual is not
competent to refuse medication if because of mental illness, develop-
mental disability, alcoholism or drug dependence, the individual is
incapable of expressing an understanding of the advantages and
disadvantages of accepting treatment, and the alternatives to
accepting the particular treatment offered, after the advantages,
disadvantages and alternatives have been explained to the individ-
ual. Following a final commitment order, the subject individual does
not have the right to refuse medication and treatment except as
provided by this section.

state interests that justify compulsory medication. One such interest, popularly known as the state's police power, allows the state to take action to prevent an individual from harming himself or others. In cases of emergency where a patient poses a physical threat to himself or others, the state may coercively administer medication to diffuse the threat. The other state interest, termed *parens patriae,* is a reflection of the state's continuing obligation to care for those individuals who are unable to care for themselves. Thus, when a person is incompetent to make a decision about medical treatment, the state may compel that type of treatment which it believes will best meet the patient's needs.[5]

The state asserts that involuntarily committed patients do not possess the requisite capacity to appreciate their condition and, therefore, lack the judgmental ability to make decisions regarding the administration of psychotropic drugs. In essence, the state argues that incompetency is inferred by status. We reject this inference because it has no basis in our statutes.

The state relies on sec. 51.59, Stats., which provides:

---

[5] We note that in the initial version of the mental health patients' "Bill of Rights," sec. 60, ch. 430, Laws of 1975, the legislature invoked only the state's police power. Thus, the newly-created sec. 51.61(1)(g), Stats. (1975), tersely provided:

> Prior to the final commitment hearing and court commitment orders, [patients] have the right to refuse all medication and treatment except in a life threatening situation, or in a situation where such medication or treatment is necessary to prevent serious physical injury to the patient or others. Medications and treatment may be refused only as provided in par. (h).

During its next session, the legislature amended sec. 51.61(1)(g) to its current form. Sec. 98, ch. 428, Laws of 1977.

**Incompetency not implied.** (1) No person is deemed incompetent to manage his or her affairs, to contract, to hold professional, occupational or motor vehicle operator's licenses, to marry or to obtain a divorce, to vote, to make a will or to exercise any other civil right solely by reason of his or her admission to a facility in accordance with this chapter or detention or commitment under this chapter.

(2) This section does not authorize an individual who has been involuntarily committed or detained under this chapter to refuse treatment during such commitment or detention.

Actually, the state completely depends on subsection (2) and, like the federal district court in *Stensvad v. Reivitz*, 601 F. Supp. 128 (W.D. Wis. 1985), entirely glosses over subsection (1). In the words of the *Stensvad* court, *id.* at 131:

> [I]nvoluntary treatment by antipsychotic drugs must be considered to be within the contemplation of the committing court. It seems clear under [section] 51.59 that an involuntary commitment is a finding of incompetency with respect to treatment decisions. Nonconsensual treatment is what involuntary commitment is all about.

This court declines to hold that incompetency is to be inferred by the status of involuntary commitment, particularly since this conclusion ignores the clear mandate of sec. 51.59(1), Stats. The state essentially contends that what subsection (1) giveth, subsection (2) lawfully taketh away. In analyzing a similar conundrum found in the Massachusetts' mental health statutes, a federal district court suggested that the government's position meant that "although a committed mental patient would be presumed competent to deed his home

to his doctor, he would not be presumed competent to decide whether to follow that doctor's advice concerning taking of medication. Such an argument would make a doubter of even the most credulous." *Rogers v. Okin*, 478 F. Supp. 1342, 1361 n.12 (D. Mass. 1979).

The state argues that the constitutional rights of involuntarily committed individuals are protected because all patients may challenge treatment conditions pursuant to the grievance procedure and court actions outlined in secs. 51.61(5) and (7), Stats. This argument is specious because these statutes come into play only after the constitutional infringement has occurred. As for the state's concomitant suggestion that all patients are given ample opportunity to question treatment decisions at every step in the commitment process, this is simply an unsupported hypothesis. Nowhere in the statutory scheme exhaustively chronicled in ch. 51 does the involuntarily committed individual receive the same procedural protection that is provided to precommitment detainees in sec. 51.61(1)(g), Stats.

Finally, the state contends that its economic interest in cost-efficient treatment of the mentally ill is sufficient to justify its unequal treatment of the involuntarily committed. In our review of the record we could find no statistical basis for this extravagant claim. Thus, we decline to balance an undocumented economic interest with the right to exercise informed consent.

The facts at bar are uncontroverted. No emergency existed; nor is it argued that the petitioners posed a physical threat to themselves or others. Incompetence was not found to exist; in fact, the state admits to the coercive administration of psychotropic medicine to individuals regardless of competency. The state, however, advances no rational basis for its refusal to grant

involuntarily committed individuals the right to a competency hearing.

We conclude that sec. 51.59(1), Stats., precludes the inference of incompetency. In certain cases it is possible that an involuntarily committed individual may retain the competency to gauge the advantages and disadvantages of psychotropic drugs. This is particularly true where the individual concerned has suffered, or witnessed, adverse reactions to such drugs in the past. We therefore declare that the procedure outlined in sec. 51.61(1)(g), Stats., for determining competency, must be applied to all individuals involuntarily committed under secs. 51.20(13), 51.45(13), 91.14(5) and 971.17(1), Stats., before the right to exercise informed consent is withdrawn.

*By the Court.*—Judgment affirmed in part and reversed in part.