Richard S. MARCUS, an individual trading as Stanton Blanket Company, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 26, Docket 29490.

United States Court of Appeals Second Circuit.

Argued Oct. 4, 1965.

Decided Dec. 17, 1965.

**86**

Cyrus M. Diamond, Hamden, Conn., for petitioner.

Gerald J. Thain, Atty. for Federal Trade Commission (James McI. Henderson, Gen. Counsel for Federal Trade Commission, J. B. Truly, Asst. Gen. Counsel, Harold A. Kennedy, Washington, D. C., Attorney), for respondent.

Before WATERMAN, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge:

Petitioner, Marcus, is an individual trading as the Stanton Blanket Company of Bridgeport, Connecticut. He is a converter or wholesaler of blankets who either buys cloth and remnants and cuts them into blankets, or buys blankets directly from manufacturers for resale. Petitioner's blankets all bear his label when sold. Sometimes the labels are attached by petitioner's employees at his warehouse; on other occasions, petitioner sends his labels directly to manufacturers who attach them and "drop ship" the blankets to the purchaser. Petitioner has been in business for approximately eight years. His volume of business was $725,000 in 1962, and $650,000 in 1963; he sold between 300,000 and 325,000 blankets in 1963.

Petitioner is charged with misbranding blankets in violation of §§ 4(a) (1) and (2) of the Wool Products Labeling Act, 15 U.S.C. §§ 68b(a) (1) and (2), which read in relevant part:

"(a) A wool product shall be misbranded—

(1) If it is falsely or deceptively stamped, tagged, labeled, or otherwise identified.

(2) If a stamp, tag, label, or other means of identification, or substitute therefor under section 68c of this title, is not on or affixed to the wool product and does not show—

(A) the percentage of the total fiber weight of the wool product, exclusive of ornamentation not exceeding 5 per centum of said total fiber weight, of (1) wool; (2) reprocessed wool; (3) reused wool; (4) each fiber other than wool if said percentage by weight of such fiber is 5 per centum or more; and (5) the aggregate of all other fibers * * *."

Four blankets, all purchased between May and July 1964, were received in evidence as proof of misbranding. The first blanket, Commission Exhibit #8, bore a Stanton Blanket Company label setting forth the fiber content as "70% wool, 30% rayon." Tests showed the content to be 79.0% wool, 5.9% nylon, 1.0% viscose, 10.1% orlon and 3.5% other fibers. Two other blankets, Exhibits #17 and #22, bearing petitioner's labels setting forth their content as "90% wool, 10% nylon" were shown to contain 89.9% wool, 3.8% nylon, 0.5% viscose, 5.0% orlon (Exhibit #17) and 93.7% wool, 2.0% nylon, 4.3% other fibers (Exhibit #22), respectively. The label of the fourth blanket, Exhibit #29, bore petitioner's Wool Products Labeling Number and stated a fiber content of "100% all wool." Subsequent tests showed the presence of 14.2% to 14.3% residue other than wool.

A fifth blanket, Exhibit #35, was purchased on March 4, 1964, after the issu-

ance of the complaint, as evidence of a "continued violation."[1] This blanket bore petitioner's label showing the fiber content to be "100% all wool." Tests showed that the blanket was approximately 94.9% wool; it was conceded that this calculation "could be off in one area as much as two percent."

Thus, two of the blankets contained more wool than petitioner claimed. For reasons which will be developed later, we hold that understatement of the amount of wool was not a violation of the Wool Products Labeling Act. Two other blankets had less wool than was indicated on the label, but in both cases the variation was minimal. We hold that such minor variations fall within the purview of § 4(a) (2) (A) of the Act, which excuses "unavoidable variations in manufacture." Therefore, only in the case of one blanket, Exhibit #29, did the overstatement of wool content represent a meaningful variation. Petitioner sold over one million blankets during the period under investigation. A deficiency in one of five blankets tested does not constitute substantial evidence of misbranding.

We also reject the Commission's argument that failure to indicate in exactly correct proportions the character of all non-wool fibers is a violation of the Wool Products Labeling Act.

The Commission also found that petitioner had engaged in false invoicing in violation of § 5(a) (1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (1). The only evidence presented concerning the alleged violation was an invoice issued in connection with the sale of the first blanket, Exhibit #8. The invoice read "70% wool, 30% nylon"; petitioner's enclosed labels read "70% wool, 30% rayon." The test results, already produced above, showed the blanket to be 79% wool, 5.9% nylon, 1.0% viscose, 10.1% orlon and 3.5% other fibers. We

find that the single invoice upon which the alleged violation is predicated constitutes neither substantial evidence of misrepresentation nor satisfactory proof that the public interest has been adversely affected. We therefore set aside the order of the Commission.

I.

The purpose of the Wool Products Labeling Act is stated in its preamble:

"An Act to protect producers, manufacturers, distributors, and consumers from the *unrevealed presence of substitutes and mixtures* in spun, woven, knitted, felted, *or otherwise manufactured wool products* and for other purposes." (Emphasis added.)

The legislative history makes it clear that, in passing this Act, Congress intended to protect consumers against the concealment of substitutes for wool in products claimed to be made wholly or partially of wool.

Senator Wheeler of Montana, Chairman of the Senate Conference Committee on the bill, observed:

"*The object of this bill is to protect the consumer as well as the producer of wool.* It is to protect the producer of wool, the sheepman and the producers of these other things (novelty fibers) *from the fraud that is perpetrated upon the consumer when he buys something that is marked 'all wool' or 'wool' when in effect, it is not wool,* because it has been chopped up into what in common parlance among manufacturers, is called shoddy." 86 Cong.Rec. 18174–75 (1941). (Emphasis added.)

Senator Thomas of Oklahoma, a major critic of the legislation, complained:

"[W]e are now dealing with the subject of wool. The purpose of the bill is to raise the price of wool. * * * I maintain that the bill is

1. Commission investigator Posnick testified to the purchase of a sixth blanket, on March 10, 1965, for the purpose of showing continued violation. However,

preliminary tests on this blanket, labeled "100% all wool," showed no misbranding and the blanket was never introduced into evidence.

an anticotton bill. If the bill increases the demand for wool, it decreases the demand for products such as cotton, silk, rayon, nylon, and other substitutes for wool." 86 Cong.Rec. 12907, 12908 (1940). (Emphasis added.)

He was answered by Senator Chavez of New Mexico, who argued:

"I do not think Congress would be doing too much for the wool grower if it should pass a bill providing, in effect, that *if one asks for a wool blanket it shall be a wool blanket. That is all there is to the bill.*" 86 Cong.Rec. 12908 (1940).[2] (Emphasis added.)

Respondent contends that: (1) the Wool Products Labeling Act requires an accurate statement concerning *all* constituent fibers, not just wool, and (2) that an "understatement of woolen content must violate the statute."

To substantiate its first contention, respondent points to § 4(a) (2) (A) of the Wool Products Labeling Act[3] which declares a wool product to be misbranded when the label fails to disclose the percentage of total fiber weight of "each fiber other than wool" that constitutes five percent or more of the total fiber weight of the product. But Congress could not have intended to encompass

within the purview of this clause a situation in which wool, a superior fiber, is substituted for an inferior fiber. Congress by passing the Wool Products Labeling Act intended to protect the public against inferior wool substitutes; there is no hint in the legislative history that Congress wished to "protect" the public against superior wool products. Clearly, the labeling requirement for inferior fibers is not applicable where the percentage of wool is underestimated.

Similarly, if the percentage of wool is correctly stated, the Act is not concerned with the accuracy of statements about other constituent fibers. The Commission apparently concedes that designating all other fibers simply as "man made fibers" would be a sufficient compliance with the Act. Congress in passing the Act was not interested in labeling *per se,* its focus was on wool.[4]

Respondent argues that the understatement of wool content is itself a mislabeling within the meaning of the Act. But Congress clearly intended no such result. Where the amount of wool has been underestimated §§ 4(a) (1) and (2) are inapplicable. As Bruckner, a Commission witness who has had eighteen years of experience in the trade,[5] testified "a high wool content is a mark of a better product in blankets."

---

2. Senator Johnson of Colorado, a leading proponent of the bill and a member of both the Committee on Interstate Commerce, which reported out the bill, and the Senate Conference Committee, summarized the bill as follows:

"In general the purposes of the Wool Products Labeling Act are to minimize or prevent the concealing of adulterants and inferior substitutes in cloth and wearing apparel, and to give consumers of such articles an opportunity to know what they are buying.

* * * The honest manufacturer of fabrics must and does meet the price of his unethical competitors. If they sell a cheap substitute for the real thing at a low price he must be realistic and match that price. This legislation will protect the honest manufacturer who wants to put out quality goods. No longer will he have to meet

the unfair competition of the fellow who sells shoddy wool for pure wool. * * * When he (the consumer) buys a pure wool suit he wants it to be wool and not shoddy or some other substitutes for wool. That is the basis for the so-called wool products labeling bill. * * * This bill merely stops the racket of selling such inferior substitutes as virgin wool." 86 Appendix to the Cong.Rec. 6053–54 (1940).

3. See 15 U.S.C. § 68b(a) (2) (A) supra.

4. There are, of course, other acts, for example § 5(a) (1) of the Federal Trade Commission Act, under which deceptive practices as to constituent fibers can be controlled.

5. Bruckner is the manager of the store, the Medical Service Company, from which Exhibit #8 was purchased.

## II.

The wool content was overestimated by .1% in Exhibit #17, and by as low as 3.1% and a test average of 5.1% in Exhibit #35. Masterson, an expert witness for the Commission who had tested Exhibit #35, answered "yes" to a question about whether "it could have had ninety-five percent wool," and testified that "[Y]ou could be off in one area as much as two percent." Petitioner contends that there were "unavoidable variations" within the meaning of § 4(a) (2) (A) of the Wool Products Labeling Act, 15 U.S.C. § 68b(a) (2) (A). We agree.

Section 4(a) (2) (A) provides:

"[D]eviation of the fiber contents of the wool product from percentages stated on the stamp, tag, label, or other means of identification, *shall not be misbranding* under this section if the person charged with misbranding proves *such deviation resulted from unavoidable variations in manufacture* and despite the exercise of due care to make accurate the statements on such stamp, tag, label, or other means of identification." (Emphasis added.)

Congress in passing this provision recognized that some reasonable tolerance would have to be allowed in the manufacturing process and wished to protect manufacturers and wholesalers against the imposition of impossible burdens. See Beacon Manufacturing Company, 46 F.T.C. 1073 (1949).

The Commission argues that 5% is the maximum variance contemplated by this section, and that a showing of due care is necessary before the section can become applicable.

Even if we assume that the Commission's interpretation of § 4(a) (2) (A) is correct, petitioner's defense of "unavoidable variation" must be accepted.

Exhibit #17 is within the assumed maximum variation, and, we believe, the uncertainty as to the exact percentage of variance in Exhibit #35 must be resolved in favor of a finding that that blanket is also within the "maximum." Petitioner

has shown due care by spot checking about 10% of his products and by performing extra tests when he believes his purchases to be mislabeled. Those blankets that are "drop shipped," and consequently never seen by petitioner, are purchased from large, reputable manufacturers in the United States. As to these, petitioner testified "great care is taken so that whatever the manufacturer's label says, that's what our label says" (R. 7). The Commission made no attempt to refute the testimony as to the care used in the labeling of wool.

Petitioner sold between 300,000 and 325,000 blankets in 1963, and over 1,000,000 blankets during the period under investigation. The Commission's original blanket sample was small. In the case of only one of the five blankets tested, Exhibit #29, did the petitioner's overestimation of wool content violate the statute. This does not constitute substantial evidence of misbranding.

The only evidence introduced in support of the Commission's allegations concerning violations of § 5(a) (1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (1), was a single invoice, involving one transaction. The invoice contained statements representing petitioner's blankets to be "70% wool, 30% nylon." Petitioner testified that the invoice had read "30% nylon" instead of "30% rayon" due to a typographical error by his secretary. This testimony was corroborated both by the fact that the consumer, Medical Service Company, had ordered "30% rayon" blankets and by petitioner's labels, attached to each blanket, stating "70% wool, 30% rayon."

We have already decided the variations shown in the composition of Exhibit #8, the blanket described in the invoice, do not violate the Wool Products Labeling Act. For the same reasons, we find that the variations between the content of Exhibit #8 as described in the invoice and as found after testing do not constitute satisfactory proof that the present proceeding is in "the interest of the public" as required by § 5(b) of the Federal Trade Commission Act. Moreover,

the single invoice does not provide substantial evidence of "deceptive acts or practices." § 5(a), 15 U.S.C. § 45(a).

 Since there is no indication that additional evidence would be available to the Commission on remand, we set aside the order. See Rayex Corp. v. Federal Trade Comm., 317 F.2d 290, 295 (2d Cir. 1963).

In view of our disposition of the case, we need not pass upon the other points raised by petitioner.

Order set aside.