The **FIRESTONE TIRE & RUBBER COMPANY**, Petitioner,

v.

**FEDERAL TRADE COMMISSION**, Respondent.

No. 72–1990.

United States Court of Appeals, Sixth Circuit.

Argued April 4, 1973.

Decided June 27, 1973.

Fred H. Bartlit, Jr., Kirkland & Ellis, Chicago, Ill., for petitioner; Hammond E. Chaffetz, Thomas A. Gottschalk, Kirkland & Ellis, Chicago, Ill., William L. Blum, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, on brief; John F. Floberg, Harold L. Henderson, Akron, Ohio, of counsel.

Louis C. Keiler, Jr., Ronald M. Dietrich, Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Miles J. Brown, Washington, D. C., for the Federal Trade Commission.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

EDWARDS, Circuit Judge.

Petitioner Firestone seeks review of an order of respondent Federal Trade Commission under 15 U.S.C. § 45(c) (1970). FTC had found Firestone guilty of unfair and deceptive advertising, in violation of 15 U.S.C. § 45(a)(1970), in relation to two particular advertisements. One of them may be characterized as the "Safe Tire" ad and the second ad as the "Stop 25% Quicker" ad.

### I  The "Safe Tire" Ad.

As to this series of advertisements, the parties stipulated as follows:

I. *Duration of Advertising Program*

1. Beginning on December 25, 1967, and continuing through May 18, 1968, the following text, or a text substantially similar to it, was used in certain Firestone advertisements:

THE SAFE TIRE. FIRESTONE When you buy a Firestone tire—no matter how much or how little you pay—you get a safe tire.

Firestone tires are custom-built one by one. By skilled craftsmen. And they're personally inspected for an extra margin of safety. If these tires don't pass all of the exacting Firestone inspections, they don't get out.

Every new Firestone design goes through rugged tests of safety and strength far exceeding any driving condition you'll ever encounter. We prove them in our test lab. On our test track. And in rigorous day-to-day driving conditions. All Firestone tires meet or exceed the new Federal Government testing requirements. (They have for some time.)

Firestone—The Safe Tire. At 60,000 Firestone Safe Tire Centers. At no more cost than ordinary tires.

II. *Firestone's Design And Manufacturing Testing And Quality Control Procedures*

1. The state of tire manufacturing technology in [sic] such that use of the best manufacturing procedures and tests and quality control techniques known to the industry cannot insure that each tire produced by a manufacturer is absolutely free from any defects in materials or workmanship.

2. During the period of the advertisements set forth above, Firestone exercised due care and used its best efforts to employ the best manufacturing procedures and tests and quality control techniques known to the industry to design and manufacture tires free from defects in materials and workmanship.

As to this issue the Commission's opinion says:

We conclude that respondent's absolute representation that its tires are "safe" is false and deceptive on its own admission that tires cannot under today's technology be assured of being free of defects. In view of this technological impossibility, it is an unfair and deceptive act and practice for respondent to make the unqualified assertion of safety which it made in this case.

### Conditions of Use Claim

While it is clear from the face of the advertisement that respondent makes no *explicit* claim that its tires are safe under all conditions of use, we believe it does so implicitly. Respondent's advertisement asserts flatly that the Firestone tire is "The Safe Tire" and describes the exacting rugged tests ("far exceeding any driving conditions" consumers will ever encounter) which the tires are put through to assure this safety. Respondent's advertisement gives no indication that there is any limit to the safety of this tire or what such limits might be.

Firestone, on the other hand, emphasizes the stipulation recited above as to its employing the language, "the best manufacturing procedures and tests and quality control techniques known to the industry" and interprets the "Safe Tire" ad as "assuring average tire consumers that Firestone did everything humanly and technically possible to sell tires free of defects." Firestone also emphasizes that a large majority of persons interviewed concerning the "Safe Tire" ad thought that it meant something less than a guarantee of absolute safety.

As to this issue the Commission ordered Firestone to cease and desist from:

1. Representing, directly or by implication, that every purchaser of tires bearing the brand name "Firestone," or any other brand name, is assured of receiving tires free from defects in materials or workmanship or other manufacturing defects.

2. Misrepresenting, in any manner, the effectiveness of respondent's quality control or inspection procedures.

3. Using the words, "The Safe Tire," or any other word or phrase of similar import or meaning to describe or designate respondent's tires or otherwise representing, directly or by implication, that respondent's tires will be safe under all conditions of use.

4. Making any representation, directly or by implication, regarding the safety of respondent's tires without disclosing clearly and conspicuously and in close conjunction with such representation that the safety of any tire is affected by conditions of use, such as inflation pressure, vehicle weight, wear, and other operating conditions.

In approaching decision of this issue, this court is limited by statute and case law as to its proper function. The statute which provides for our review also provides that "the findings of the Commission as to the facts if supported by evidence, shall be conclusive." 15 U.S.C. § 45(c) (1970). This court has described such findings as "entitled to be given great weight," and has noted that "the Commission is permitted to draw reasonable inferences from the evidence . . ." Doherty, Clifford, Steers & Shenfield, Inc. v. FTC, 392 F.2d 921, 925 (6th Cir. 1968).

Even more to the point and worth quoting at length is the following description of our function in the words of a leading Supreme Court opinion:

In reviewing the substantive issues in the case, it is well to remember the respective roles of the Commission and the courts in the administration of the Federal Trade Commission Act. When the Commission was created by Congress in 1914, it was directed by § 5 to prevent "[u]nfair methods of competition in commerce." Congress amended the Act in 1938 to extend the Commission's jurisdiction to include "unfair or deceptive acts or practices in commerce"—a significant amendment showing Congress' concern for consumers as well as for competitors. It is important to note the generality of these standards of illegality; the proscriptions in § 5 are flexible, "to be defined with particularity by the myriad of cases from the field of business." Federal Trade Comm'n v. Motion Picture Advertising Service

Co., 344 U.S. 392, 394, 73 S.Ct. 361, 97 L.Ed. 426.

This statutory scheme necessarily gives the Commission an influential role in interpreting § 5 and in applying it to the facts of particular cases arising out of unprecedented situations. Moreover, as an administrative agency which deals continually with cases in the area, the Commission is often in a better position than are courts to determine when a practice is "deceptive" within the meaning of the Act. This Court has frequently stated that the Commission's judgment is to be given great weight by reviewing courts. This admonition is especially true with respect to allegedly deceptive advertising since the finding of a § 5 violation in this field rests so heavily on inference and pragmatic judgment. Nevertheless, while informed judicial determination is dependent upon enlightenment gained from administrative experience, in the last analysis the words "deceptive practices" set forth a legal standard and they must get their final meaning from judicial construction. Cf. Federal Trade Comm'n v. R. F. Keppel & Bros., Inc., 291 U.S. 304, 314, 54 S.Ct. 423, 427, 78 L.Ed. 814. FTC v. Colgate-Palmolive Co., 380 U.S. 374, 384–385, 85 S.Ct. 1035, 1042, 13 L.Ed. 2d 904 (1965). (Footnotes omitted.)

■ Employing these standards, we affirm the findings of the FTC on the "Safe Tire" issue and enforce its order.

There is, of course, no question but that the ad indulges in some puffing. The statement, "When you buy a Firestone Tire . . . you get a safe tire," contains no use qualifications as to inflation, load and speed, and is measured against no comparative performance.

When the statement is compared to the stipulation previously quoted, its deficiencies are obvious:

1. The state of tire manufacturing technology in [sic] such that use of the best manufacturing procedures and tests and quality control techniques known to the industry cannot insure that each tire produced by a manufacturer is absolutely free from any defects in material or workmanship.

This stipulation, in effect, concedes that defective Firestone tires can and do reach the consumer.

We deal, of course, with a statutory ban on "unfair or deceptive acts or practices." If no one were misled, we might reexamine our own conclusions vis-a-vis the Commission's inferences about this ad in considerably more detail. Here, however, Firestone's own consumer survey demonstrated that 15.3% of a scientifically selected sample of tire purchasers thought the "Safe Tire" ad meant:

(d) "Every Firestone tire is absolutely safe no matter how it is used and regardless of the tire inflation pressure and load of the car;" or "Every single Firestone tire will be absolutely free from any defects."

We find it hard to overturn the deception findings of the Commission if the ad thus misled 15% (or 10%) of the buying public.

We find no overbreadth or deficiency in the remedial order of the Commission, and as to it we affirm and grant enforcement.

II The "Stops 25% Quicker" Ad.

The Firestone "Stops 25% Quicker" ad reads:

" . . . Like the original Super Sports Wide Oval Tire. It came straight out of Firestone racing research. It's built lower, wider. Nearly two inches wider than regular tires. To corner better, run cooler, stop 25% quicker."

By stipulation the parties agreed that the "stop 25% quicker" portion of the ad above was employed by Firestone in nationwide magazine advertising from January 16, 1967 to September 20, 1968, and omitted thereafter.

The only comparative stopping test submitted by Firestone was also stipu-

lated by the parties as having been proved for this proceeding:

```
TESTED 5-13-66
SURFACE WET SMOOTH CONCRETE
STOPPING DIST.   LOAD—1120 LBS/TIRE INFL—
24 PSI
SIZE
```

| 7.75-14 | F70-14 |
|---------|--------|
| 002AD363 | L3126-03 |
| 002AD389 | L3126-08 |
| 75 FT TO | 54 FT TO |
| 80 STOP | 55 STOP |
| 70 | 55 |
| 78 | 55 |
| 75 | 51 |
| 78 | 52 |
| 75 | 50 |
| 75 | 54 |
| 75 | 54 |
| 77 | 52 |
| AVG. 75.8 | 53.2 |

The Commissioner's position on this issue is stated as follows:

In sum, we find that the admitted circumstances under which respondent tested its tires were limited and that despite these limited test conditions, respondent used these tests as its sole support for its advertisement representing that its Wide Oval tires would stop 25% quicker under all road and weather conditions and relative to all other types of regular tires. Its test did not support, either directly or by reasonable extrapolation, respondent's broad stopping claim. The particular claim at issue here involves a matter of human safety. It is a claim which consumers themselves cannot verify since they have neither the equipment nor the knowledge to undertake the complicated tire tests required. They must rely on the technical expertise of the manufacturer to assure the validity of its claims. Under such circumstances, it is both unfair and deceptive to consumers to make a specific advertising claim without substantial scientific test data to support it.

Firestone's position, on the other hand, as stated in its brief is as follows:

As set forth in the statement of facts, there is no dispute in the record that (1) Firestone conducted stopping tests of its Wide Oval tires prior to publishing the advertised claim, (2) Firestone's tests were adequate and well controlled scientific tests conducted according to established technological standards, (3) the wet concrete test surface was a typical wet hazardous road surface which might be encountered by motorists, (4) the tests demonstrated that on the wet concrete surface, the Wide Oval tire stopped 29.8% quicker than the regular width tire. These record facts, combined with Dr. Brenner's expert conclusion that the effect of the greater tread width would be more pronounced on dry surfaces, affirmatively demonstrate that Firestone's scientific tests adequately established the factual accuracy of the "stops 25% quicker" comparison between the Wide Oval and narrow tires.

As to this issue the Commission's order directed Firestone to cease and desist from:

5. Representing, directly or by implication, that any of respondent's automobile tires have any safety or performance characteristic or are superior in quality or performance to other products unless each such characteristic was fully and completely substantiated by competent scientific tests, with the results of the test, the original test data collected in the course of the test, and a detailed description of how the test was performed available in written form for inspection for at least three years following the final use of the representation.

On this appeal Firestone argues that 1) its ad did not impliedly assert that the "stops 25% quicker" language was based on scientific testing and that the Commission made no explicit finding to that effect; 2) that in any event, its own series of tests on wet, slippery pavement did represent adequate scientific proof of its assertion, or if not that, such proof could reasonably be extrapolated from that test, and 3) that the cease and desist order was unreasonably broad and restrictive in requiring

scientific proof as to *any* safety or performance characteristic advertised.

As to the first of these issues, we believe the Commission did find that the "Stops 25% Quicker" ad implied scientific testing. It said:

> In the circumstances of *this* case, we believe that consumers could reasonably have expected Firestone's performance and safety claims to have been substantiated by scientific tests.

In addition, we think such an implication is entirely reasonable from the comparison and percentage language employed.

As to Firestone's second argument above, we note at the outset that Firestone presented no witnesses at all in this proceeding. It relied entirely upon data provided by a comparison of two tires (both Firestone products) in ten runs on the same day on the same wet, smooth concrete surface at 15 m.p.h. with the same tire pressure and load. These ten runs showed an average stopping distance of 29.8% less for the Firestone Super Sports Wide Oval tire as compared to a Firestone Super Sports tire of standard tread width.

The Commission makes no comment derogatory to the scientific nature or the accuracy of the test upon which Firestone relies. Rather, it attacks the adequacy of one set of tests on one surface (we would be tempted to add, at one speed) to support the "stops 25% quicker" generalization. Of course, we note that the Commission's own expert witness, Dr. Brenner, seemed to concede that a tire which stopped quicker on a wet surface would, under similar conditions, as to surface, speed, etc., stop still more quickly on a dry surface. What Dr. Brenner would not concede was that

testing on any one surface was adequate to represent driving conditions nationwide. As to his own testing practices, he testified:

> In our attempts to develop a test method in order to establish a standard for traction, we laid out five surfaces with different coefficients of friction and different textures, and we ran somewhere in the neighborhood of sixty-five different sets of tires through a variety of tests using skid trailers and vehicle in two maneuvers, stopping distance and in spin-out on a curve. And then we ranked the tires according to their performance on each test, on each surface in each maneuver.

We are by no means sure that the Firestone Wide Oval tire does not "stop 25% quicker." But that is not our question. We have to deal with the record that has been submitted in this case. On this record we conclude that the Commission's finding (that Firestone's "broad stopping claim" was "unfair and deceptive to consumers" because it was "without substantial scientific test data to support it") was supported by the evidence in this record and by the fair inferences which the Commission was entitled to draw therefrom. Under our limited standard of review, we certainly cannot hold to the contrary. FTC v. Colgate-Palmolive Co., 380 U.S. 374, 384–385, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965).

As to Firestone's third argument regarding the "stops 25% quicker" ad, we find no overbreadth or violation of due process in the cease and desist order paragraph 5.

The Commission's order to cease and desist is affirmed and granted enforcement.