**WALLACE OIL CO., INC., Plaintiff,**

v.

**Robert MICHAELS, Leo Fotopoulos, SPI Petroleum, Inc., Abdul Khan, Salim Ejaz and John Doe Corps., Defendants.**

**No. 90 Civ 8769 (VLB).**

United States District Court, S.D. New York.

Dec. 14, 1993.

Carl S. Levine, Roslyn, NY, for plaintiff.

Wayne D. Lonstein, Ellenville, NY, for SPI defendants.

Daniel K. O'Connor, Fotopoulos, Rosenblatt, Green, Frasciello, O'Connor & Gall, P.C., New York City, for defendant Leo Fotopoulos.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case involves questions concerning a clash between the right of a gasoline supplier to enforce exclusive purchase agreements with local stations and the right of a new gasoline station owner to change the station's source of supply. It also raises issues concerning whether the logo of the old source must be removed before any differing gasoline is placed in a pump, and the consequences of any delay in changing the logo.

The litigation arises from a shift in ownership and source of gasoline supply at a local gasoline service station at 484 North St., Middletown, New York (the "station"). These events generated claims by plaintiff Wallace Oil Co., Inc. ("Wallace"), a former supplier of gasoline to the station defendant Robert Michaels ("Michaels"), of trademark

infringement in violation of the Lanham Act (15 U.S.C. § 1051 *et seq.*) (the "Trademark Act") by the new owner of the station, defendant Leo Fotoupolos ("Fotoupolos") and the new gasoline supplier, defendant SPI Petroleum, Inc. ("SPI"). Wallace also asserted pendent state claims for breach of a long-term exclusive gasoline supply contract between Wallace and Michaels, and interference that contract by SPI.

On or shortly before August 16, 1991, Michaels transferred control, operation and ownership of the station to Fotoupolos; SPI replaced Wallace as the source of gasoline supply to Fotoupolos as new owner. On August 16, 1991, an SPI truck arrived at the station to deliver gasoline although a sign bearing the SUNOCO trademark (that of Wallace's source of supply) was prominently displayed above the station. SPI states that it declined to pump gasoline until that sign was covered and any other SUNOCO names removed from display.

Wallace has settled with Michaels. SPI and Fotopoulos have moved for summary judgment. Because of inadequacy of factual presentations by all parties, I deny the motions without prejudice, and describe below the issues I find the parties should address.

## II

■ The primary purpose of trademark law is to avoid confusion on the part of purchasers concerning the origin of goods or services. See generally *San Francisco Arts & Athletics v U.S.O.C.*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987).

■ Presence of an obsolete sign containing the trademark of a product no longer offered is potentially confusing. Continued display of such a sign or a likelihood of such display would justify injunctive relief. See 15 U.S.C. § 1116; *Charles of the Ritz Group v. Quality King*, 832 F.2d 1317 (2d Cir.1987). Injunctive relief can be granted without proof of actual monetary or other injury, so long as such injury is threatened. See *General Leaseways v. National Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir.1984) (injunctive relief), and the same case at 830 F.2d 716 (7th Cir.1987) (zero damages).

■ Evidence of actual confusion or reason to infer actual confusion on the part of customers will support damage claims. See 15 U.S.C. § 1117; *Hesmer. Foods v. Campbell Soup*, 346 F.2d 356 (7th Cir.), *cert. denied* 382 U.S. 389, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965). Intentional use of another's mark suggests likelihood of actual confusion. *Mobil Oil Corp. v. Pegasus Petroleum*, 818 F.2d 254, 258 (2d Cir.1987).

In the present case, plaintiff has submitted photographs showing an SPI truck arriving at the station to deliver gasoline while a large SUNOCO sign towers above the station. While SPI asserts that the SUNOCO logo was covered over before gasoline was pumped, this was clearly not done as of the time the SPI truck arrived. See *Little Tor Auto Center v. Exxon*, 830 F.Supp. 792 (S.D.N.Y.1993).

There is no evidence now before me, however, suggesting that the SUNOCO name remained visible for more than a few hours at most, is continuing to be, or is threatened to be, used at the station. Nor is there any evidence that presence of the SUNOCO name during any brief display at the station after SPI gasoline was pumped led to any actual confusion.

■ Where improper action is taken, such as delivery of non-SUNOCO gasoline combined with discontinuance of SUNOCO gasoline before removing the SUNOCO sign, but no traceable or implicit adverse consequences flow, it is possible that there may be a legal violation but no relief which can be granted. See generally Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127 (1976).

■ It is important not to encourage use of suits under federal statutes to remedy *de minimis* infractions; to permit this would lead to invocation of the judicial power established by the Constitution as a device to get even with rivals rather than to uphold the objectives of statutes passed by Congress. See *Marcus v. FTC*, 354 F.2d 85 (2d Cir. 1965), discussed in 735 F.2d LVI, LXVII—LXVIII (1981) (Proceedings in Honor of Paul R. Hays); see also *Gonzalez v. St. Marga-*

*ret's House Housing Development Fund,* 880 F.2d 1514, 1518 (2d Cir.1989).

■ Where a practice exists which can in the aggregate have nefarious consequences, some relief may be necessary to uphold statutory objectives. See *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The conduct of the station owners in regard to the short overlap between the beginning of SPI gasoline delivery and the removal of the SUNOCO sign appears to fall in the nonremedial category. I accordingly find no basis for Wallace to pursue its trademark claim against Fotopoulos or others who might have had interests in the station. The comments made here concerning the Trademark Act also apply to any state law unfair competition claim.

■ SPI as a gasoline distributor, however, permitted its truck to arrive for the purpose of delivering gasoline at a location which appeared from a large dominating sign to be a station advertised as a purely SUNOCO outlet. If plaintiff can establish that SPI's action represented a course of conduct that may continue where shifts in sources of supply occurred involving accelerated deliveries before changes in trademark logos, rather than an individualized minor and quickly corrected error, injunctive relief against SPI might be justified despite the absence of traceable damage.

Because Wallace was not put clearly on notice of the necessity to submit such evidence if available, I refrain from deciding whether any claim for injunctive relief under the Trademark Act against SPI can survive. See *Celotex v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

### III

Both Wallace and SPI employ long-term requirements contracts, barring purchase of competing gasolines on the part of the station. Wallace's contract was with Michaels, running for 3½ years from May 2, 1990. Wallace claimed that SPI interfered with and induced breach of that contract.

■ SPI seeks summary judgment on the ground that it lacked specific knowledge of Wallace's agreement and took no deliberate action to cause its breach. SPI, however, employs such contracts itself, quite probably knew of the similar Wallace—Michaels contract, and knew that the agreement with Wallace had to be disregarded in order for SPI to become the gasoline supplier to the station. Once a case is brought in the federal courts, the parties can no longer restrict the issues considered, even if the opposing party chooses to ignore some, if they might bar grant of the relief requested for reasons relevant to public policy. See *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *Marock v. Brinkmann Corp.,* 1993 WL 349684, 1993 U.S.Dist. LEXIS 12892 (Sept. 13, 1993); see also *United States v. Gulla,* 833 F.Supp. 274 (S.D.N.Y. 1993).

■ SPI's grounds for moving for summary judgment on the interference claim run counter to ordinary expectations concerning business conduct, see *University Computing Co. v. Management Science,* 810 F.2d 1395, 1399 (5th Cir.1987), and are unrealistic. The court, however, has the authority—and where issues of public policy may be involved, the duty—to place the parties on notice of the need to establish a genuine issue of material fact with respect to their rights to judicial relief. *Celotex v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Wallace has failed to deal factually or legally with the issues described below. In order for its interference claim to survive under Fed.R.Civ.P. 56, Wallace must establish existence of a genuine issue of material fact with respect to these matters.

### IV

■ Requirements contracts such as those between Wallace and Michaels, and between SPI and Fotopolous, are subject to rule of reason analysis under § 1 of the Sherman Act (15 U.S.C. § 1). *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). They may be vulnerable if the effect is to foreclose competition in a relevant market. See *Unit-*

ed States v. Dairymen, Inc., 660 F.2d 192 (6th Cir.1981).

■ A violation of § 1 of the Sherman Act (15 U.S.C. § 1) requires both a contract, combination or conspiracy and an unreasonable restraint of trade as found by a full rule of reason analysis, invocation of a *per se* rule, or a quick-look or "hard boiled" rule of reason analysis, depending on the anticompetitive potential and counterbalancing benefits of a challenged course of conduct. See *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *NCAA v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *North American Soccer League v. NFL,* 670 F.2d 1249 (2d Cir.), *cert. denied* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 596–907 (7th Cir.1984); Note, 55 St. John's L.Rev. 729 (1981); Pitofsky, "Discussion," 52 Antitrust L.J. 699, 615 (ABA 1983).

Long-term commitments for large quantities of goods can have important economic advantages through savings achieved by advance planning and ability to make other commitments based on knowledge that the business will be there. See generally *United States v. General Dynamics Corp,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Texas Gulf Sulphur Co v. JR Simplot Co,* 418 F.2d 793, 805–06 (9th Cir.1969).

Economies of scale, important to reducing costs in ways beneficial to the economy as a whole, are often realistic only where advance commitments are present.[1]

The importance of ability to analyze both benefits and burdens of long-term requirements contracts is suggested by factors relevant to mergers as set forth in the revised joint Justice Department and Federal Trade Commission Horizontal Merger Guidelines (April 2, 1992), which emphasize both efficiency considerations (§ 4, p. 55–56) and ver-

tical distributional restraints (§§ 1.12, 2.11 at 15, 36).

The possibility of significant distributional restraint flowing from the kind of contract used by Wallace may be dependent in part on how prevalent such agreements are in the industry. If it is difficult for competition to arise within as well as between a given retail outlet, costs to consumers may be raised and the direct nature of competition when one must stop for fuel may be blunted.

■ No information is before me concerning (a) how widespread requirements contracts such as that between Wallace and Michaels are in regard to local service stations, (b) whether the initiative and language of such contracts emanates from sources higher up in the distribution chain and if so in what form, (c) the extent if any to which any overt or tacit division of geographical areas in non-metropolitan areas has developed, supported by such contracts, (d) the extent if any to which rivalry for supplying stations at given locations is associated with price competition at the wholesale or retail level, and (e) the extent to which other distributors are able to sustain predictable flow of gasoline by other means than use of requirements contracts with local stations.

## V

■ Assuming that the Wallace—Michaels agreement was neither an antitrust violation nor unenforceable by reason of antitrust objectives or common law rules with respect to restraint of trade, SPI might have a privilege to interfere with it. Competition is a legitimate reason for offering others willing to pay any necessary damages for breach of contract, the opportunity to change trading partners. See Restatement (Second) of Torts § 767 (1979). Without such flexibility, it has long been recognized that interference suits could place a straitjacket on healthy choices in an open economy. See

---

1. See *United States v. EI duPont de Nemours & Co,* 351 U.S. 377, 386, 76 S.Ct. 994, 1002, 100 L.Ed. 1264 (1956); Note, 58 Colum.L.Rev. 673, 683 n. 71 (1958); Arthur, "Positive Feedbacks in the Economy," 262 Sci.Am. 92 (Feb. 1990); Nadiri & Prucha, *Comparison and Analysis of Productivity Growth and R & D Investment in the*

*Electrical Machinery Industries* 28 (CV Starr Center for Applied Econ, N.Y.U., RR 88–22, June 1988) ("The most important source of growth in total productivity for both countries is the scale effect."); 41 U.S.C. § 253(b)–(f) (factors justifying single-source procurement).

Bevier, "Reconsidering Inducement," 76 Va. L.Rev. 877 (Aug 1990); Dobbs, "Tortious Interference With Contractual Relationships," 34 Ark.L.Rev. No. 3 at 335 (1980); Sayre, "Inducing Breach of Contract," 36 Harv.L.Rev. 663 (1923); Wigmore, "The Boycott and Kindred Practices as Ground for Damages," 21 Am.L.Rev. 34 (1887); Schofield, "The Principle of *Lumley v. Gye* and Its Application," 2 Harv.L.Rev. 19 (1888). Neither Wallace nor SPI have chosen to address this crucial threshold of absence of privilege on SPI's part to induce breach of the Wallace—Michaels contract, which Wallace's claim must pass in order to survive under Fed.R.Civ.P. 56.

## VI

Wallace has settled with Michaels but continues to seek recovery from SPI for the breach of contract asserted against Michaels in Wallace's complaint. No party to the current litigation has attached a copy of the settlement agreement, or described it if oral. Nor has any party briefed the crucial question of whether duplicate recovery would arise were Wallace's claim successful, or whether settlement with the contracting party bars the interference claim.

## VII

▆▆▆▆ Fotopoulos was not a signatory to the Wallace—Michaels contract. He might nevertheless be liable as a successor if he had purchased Michaels' business including its intangible assets (not merely equipment or other tangible property), or if Fotopoulos was acting as a nominee or agent of Michaels. Disregard of separate natural persons, as disregard of separate corporate entities, is permissible when but only when specific reasons for such disregard are shown. See generally 1 Fletcher, *Cyclopedia of Corporation* § 44 (rev. perm. ed. 1983). No such reasons have been set forth to date.

Similarly, no adequate basis for including SPI personnel (defendants Abdul Khan and Salim Ejaz) individually has been established. Where a solvent institutional entity such as SPI is the actor and is responsible for whatever was done, such inclusion serves no purpose even were it otherwise proper.

See *Archer v. Globe Motorists Supply Co,* 1993 WL 187913, 1993 U.S.Dist. LEXIS 7162 (S.D.N.Y.1993).

Wallace's papers make no serious effort to establish individual liability or to pursue any defendants other than SPI now that the case against Michaels has been settled. Unless otherwise indicated (accompanied by submission of factual and legal support for such liability), I will assume that Wallace's claims against remaining defendants other than SPI have been abandoned.

SO ORDERED.